**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| BECKY'S BRONCOS, LLC,<br>             Plaintiff,<br><br>v.<br><br>TOWN OF NANTUCKET and<br>NANTUCKET TOWN SELECT BOARD,<br><br>             Defendants. | )<br>)<br>)<br>)<br>)     Civil Action No. 1:24-CV-11308-AK<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO STRIKE AND MOTION TO DISMISS**

**ANGEL KELLEY, D.J.**

This case arises from a 1988 municipal ordinance restricting the licensing of rental car agencies on Nantucket Island.  Becky's Broncos, LLC ("Plaintiff" or "Becky's") brings this suit alleging violations of the dormant Commerce Clause, Section 1 of the Sherman Act, and Massachusetts Antitrust Act against the Town of Nantucket and Nantucket Town Select Board (together, the "Town" or "Defendants").  Before the Court are the Town's Motion to Strike Exhibit 1 of the First Amended Complaint [Dkt. 45] and their Motion to Dismiss for Failure to State a Claim [Dkt. 43].  For the following reasons, the Court **DENIES** Defendants' Motion to Strike [Dkt. 45], and **GRANTS** Defendants' Motion to Dismiss [Dkt. 43].

**I.      BACKGROUND**

Except where noted, the following facts are drawn from Plaintiff's Amended Complaint. In 1988, the Town adopted a licensing-and-fee ordinance for car rental agencies, codified as Nantucket Bylaw Chapter 58 ("Chapter 58"). [Dkts. 40 ¶¶ 8-9; 40-3].  The ordinance prohibits "renting, leasing, or keeping for rent or lease" mopeds or motor vehicles without first obtaining a

1

license from the Town and paying an application fee, to be renewed annually. [Dkt. 40-2]. Nine years later, the Town amended Chapter 58 to limit the total number of rental cars allowed on the island to 650, based on the number of vehicles owned by licensed agencies in the prior year. [Dkt. 40-4]. Incumbent agencies received a Rental Vehicle Medallion for each of their existing approved vehicles, which could be transferred "to any other rental agency or entity." [Id.]. If an agency surrenders its Medallions, the Town has discretion to "retain[]," "reissue[]," or "retire[]" them. [Dkt. 40-6]. The ordinance, however, is silent as to whether agencies *must* surrender unused Medallions; as a result, under the current framework, an agency may hoard excess Medallions rather than return them to the Town. [See id.]. These amendments were adopted by a majority vote of Town residents. [Dkt. 40 ¶¶ 10-11].

Although the amendments were initially intended to be a temporary measure to control growth until such growth was addressed in a subsequent "comprehensive plan," the ordinance remains substantively unchanged, except that the vehicle limit has increased modestly from 650 to 700. [Dkts. 40-4; 40 ¶¶ 12, 14]. During that same period, however, Nantucket's population has increased almost fivefold, from approximately 3,700 in 1970 to 14,500 in 2023. [Dkt. 40-1 at 3]. The island is also a popular tourist destination, particularly during the summer months. Each year, nearly 500,000 tourists visit the island, with approximately one-third arriving in July and August alone. [Id. at 4-5]. Roughly half of those summer visitors arrive by ferry [id.], and about 650 ferry passengers bring rental cars to the island. [Dkt. 40-9]. Despite this population growth and tourist volume, the total number of cars on the island has remained relatively constant, hovering at approximately 5,500. [Dkt. 40-1 at 6].

Today, only six car rental businesses hold licenses under Chapter 58. [Dkt. 40 ¶ 5]. Five are based in Nantucket, while Hertz Corporation ("Hertz") is an out-of-state company with a

local physical address. [See id.].  The five local companies collectively hold 382 Medallions, while Hertz has 310, of which it uses only 190—leaving approximately 120 unused. [Id. ¶¶ 6-7]. In addition to these six agencies, Turo, an online platform that allows individuals to rent out personal vehicles, makes around 200 cars available for rent. [Id. ¶ 34].  The Town has also received, but not reissued, eight surrendered Medallions. [Id. ¶ 28].  Several other companies have recently expressed interest in obtaining licenses or Medallions—including out-of-state companies such as Enterprise Holdings, Avis Budget Group, and Go Rentals, Inc.—but none has succeeded. [Id. ¶¶ 21-24].  The Town does not maintain a system for reissuing surrendered Medallions or compelling Hertz to use or transfer its unused Medallions. [Id. ¶ 19].

Becky's began operating in 2023, leasing two Ford Broncos without a license. [Id. ¶ 31]. The company had requested a license from the Town but was unsuccessful. [Id. ¶ 20].  On July 10, 2023, two licensed rental agencies sent a letter to the Town complaining about unlicensed businesses, including Becky's and Turo. [Id. ¶ 32; Dkt. 40-7].  In response, on September 28, 2024, the Town ordered Becky's and three other businesses to cease rental operations. [Dkt. 40 ¶¶ 20, 33, 43].  However, the Town declined to enforce Chapter 58 against Turo, claiming that its peer-to-peer rental platform might not fall within the ordinance's scope. [Id. ¶ 34; Dkt. 40-7]. Despite this public explanation, however, internal emails revealed that "[t]here are dozens if not more Town employees who are using Turo to try to make ends meet," and that one such employee "was very upset and had concerns about being able to afford to continue to live [on the island] if their ability to make extra money is curtailed by the Town." [Dkt. 40-8 at 5].

On May 16, 2024, Becky's sued the Town for monetary and injunctive relief. [Dkt. 1]. Shortly thereafter, Becky's moved for a Temporary Restraining Order and Preliminary Injunction to halt enforcement of Chapter 58 against it. [Dkt. 9].  After a hearing [Dkt. 18], the

Court denied the motion, finding that Becky's had not shown a likelihood of success on the merits. [Dkt. 23]; see also Becky's Broncos, LLC v. Town of Nantucket, No. 24-CV-11308, 2024 U.S. Dist. LEXIS 122800, at *21 (D. Mass. July 12, 2024).  Becky's appealed [Dkt. 24], and the First Circuit affirmed. Becky's Broncos, LLC v. Town of Nantucket, 138 F.4th 73, 81 (1st Cir. 2025).

Following the appeal, Becky's filed an Amended Complaint with ten supporting Exhibits. [Dkt. 40].  Exhibit 1 is an expert report by Dr. Igor Karagodsky. [Dkt. 40-1].  The Town subsequently filed a Motion to Dismiss for Failure to State a Claim [Dkt. 43] and a Motion to Strike Exhibit 1 [Dkt. 45], both of which Becky's opposes [Dkts. 49-50].

## II.   MOTION TO STRIKE

The Town moves to strike Exhibit 1 of the Amended Complaint, which the Court construes as brought under Fed. R. Civ. P. 12(f).  The Exhibit is an expert report by Dr. Igor Karagodsky analyzing Chapter 58's effects on Nantucket's tourism industry. [See Dkt. 40-1]. Under Rule 12(f), courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" on its own or on a party's timely motion. Fed. R. Civ. P. 12(f).  Generally, striking documents under Rule 12(f) is a "drastic remedy" to be employed sparingly. Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 59 (1st Cir. 2013); see also Boreri v. Fiat S.p.A., 763 F.2d 17, 23 (1st Cir. 1985) ("[S]uch motions are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion.").

The Court declines to strike Dr. Karagodsky's report.  The First Circuit has explained that "[e]xhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6)." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d

4

315, 321 (1st Cir. 2008) (quoting Fed. R. Civ. P. 10(c)).[1]  The report is therefore properly included as part of the pleading.  Moreover, none of the grounds for striking under Rule 12(f) apply—the report is not "redundant, immaterial, impertinent, or scandalous."  As with all pleadings, however, the Court will consider only the report's nonconclusory factual allegations, such as allegations as to the number of visitors and population of the Town [Dkt. 40-1 ¶¶ 6-21, 25], and will disregard legal conclusions such as interpretations of Chapter 58 or its anticompetitive effects [id. ¶¶ 26-30].

The Court also declines to convert the Motion to Dismiss to one for summary judgment under Rule 12(d)[2] or to consider Defendants' related argument that Daubert is implicated at this stage.  Under Rule 12(d), a court has discretion to convert a 12(b)(6) motion to a summary judgment motion when "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(d).  Courts typically apply this rule to "supplementary materials submitted with the motion papers"—such as defendants' attachments to a motion to dismiss or a plaintiff's attachments to an opposition to a motion to dismiss—not, as here, documents attached to the complaint itself. Trans-Spec, 524 F.3d at 321.  Moreover, on a motion to dismiss, the Court must accept the complaint's factual allegations without applying the rigorous evidentiary

---

[1] Courts in other circuits have held that expert reports attached to a complaint do not constitute "written instruments" under Rule 10(c) and therefore do not merge with the pleadings. See, e.g., Smith v. Hogan, 794 F.3d 249, 255 (2d Cir. 2015) (declining to consider affidavit attached to complaint); Barge v. Wells Fargo Bank, N.A., No. 23-CV-00189, 2025 WL 1242327, at *2 (E.D. Tex. Feb. 25, 2025) (collecting cases).  These courts reason that allowing such an incorporation would conflict with Rule 8(a)'s requirement that a plaintiff provide a "short and plain statement" of his claims. Hogan, 794 F.3d at 255.  Here, because the First Circuit has not addressed the issue and the Parties have not raised it in their briefing, the Court does not reach it for purposes of this case.

[2] Defendants do not expressly request this relief.  However, because the caselaw they cite in their Motion to Strike primarily addresses Rule 12(d), the Court construes the Motion as alternatively seeking application of Rule 12(d).

credibility analysis required at later stages; thus, <u>Daubert</u> is not implicated here. <u>See</u> <u>Alms v.</u> <u>Luminar Techs., Inc.</u>, No. 23-CV-982, 2025 WL 1531146, at \*2 (M.D. Fla. May 29, 2025) (declining to apply <u>Daubert</u> to exhibit attached to complaint).

## III.    MOTION TO DISMISS

When evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." <u>Nisselson v. Lernout</u>, 469 F.3d 143, 150 (1st Cir. 2006).  To survive dismissal, a complaint must contain sufficient factual material to state a claim for relief that is "plausible on its face." <u>Bell</u> <u>Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Ocasio-Hernandez v. Fortuno-</u> <u>Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." <u>Twombly</u>, 550 U.S. at 555 (internal citation omitted).  A court may not disregard properly pleaded factual allegations even if "actual proof of those facts is improbable." <u>Ocasio-Hernandez</u>, 640 F.3d at 12 (quoting <u>Twombly</u>, 550 U.S. at 556).  Rather, "[t]he relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." <u>Id.</u> at 13.  In making that determination, a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein, and facts susceptible to judicial notice. <u>Haley v. City of Boston</u>, 657 F.3d 39, 46 (1st Cir. 2011).

Here, Defendants move to dismiss Becky's Amended Complaint, arguing that both the dormant Commerce Clause claim and the federal and state antitrust claims fail under Rule

12(b)(6).  The Court addresses each argument in turn.

### A.        Count 1: Dormant Commerce Clause

The Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I § 8, cl. 3.  Although the Commerce Clause "is framed as a positive grant of power to Congress, [the Supreme Court] ha[s] long held that the Clause also prohibits state laws that unduly restrict interstate commerce." Ass'n To Pres. & Protect Loc. Livelihoods v. Sidman, 147 F.4th 40, 55 (1st Cir. 2025) (internal quotation marks omitted) (alterations in original) (quoting Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 588 U.S. 504, 514 (2019)).  Known as the dormant Commerce Clause, the doctrine bars states and localities from pursuing "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988).  Courts apply one of two frameworks when evaluating dormant Commerce Clause claims. See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 185 (1st Cir. 1999).  First, a regulatory measure may be *per se* discriminatory, either facially or in purpose/effect. See id.  The plaintiff bears the burden to show such discrimination. All. of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 40 (1st Cir. 2005).  If the plaintiff succeeds, the burden shifts to the government to show legitimate non-protectionist purposes and the absence of nondiscriminatory alternatives. See Fam. Winemakers of Cal. v. Jenkins, 592 F.3d 1, 9 (1st Cir. 2010).  Second, if the law is nondiscriminatory but nevertheless results in "incidental" burdens on interstate commerce, courts apply the balancing test articulated by the Supreme Court in Pike v. Bruce Church. See Houlton, 175 F.3d at 185; Pike v. Bruce Church, Inc., 397 U.S. 137 (1970).

### 1.    *Per Se* Discrimination

First, Becky's contends that Chapter 58 is *per se* invalid because it has both a discriminatory purpose and effect. [Dkt. 50 at 3].  To prevail on this theory, Becky's must show that the law systematically benefits in-state over out-of-state actors. See Walgreen Co. v. Rullan, 405 F.3d 50 (1st Cir. 2005).  Becky's fails to make such a showing.

Becky's principally relies on Walgreen Co. v. Rullan, where the First Circuit invalidated a facially neutral Puerto Rico statute governing the certification of pharmacies. Id. at 60.  There, the statute required all new "health care facilities," including pharmacies, to obtain a certificate of convenience and necessity before construction. Id. at 52-53.  The Secretary of Health retained discretion to grant or deny such applications. Id.  Existing pharmacies, more than 92 percent of which were locally owned, were exempt from the requirement. Id. at 53.  In addition, any existing facility located within a mile of a proposed pharmacy could object to a new application, thereby triggering a lengthy administrative hearing process. Id.  Applications that drew no objection were typically summarily approved. Id.  The court concluded that the scheme overwhelmingly favored local pharmacies. Id.  It highlighted that more than 50 percent of out-of-state applications were objected to (compared to fewer than 25 percent of local applications), and of those contested applications, only 58 percent of out-of-state applicants received certificates (compared to 90 percent of their local counterparts). Id. at 55-56.

Becky's argues that Chapter 58 functions similarly by favoring in-state rental agencies at the expense of newcomers. [Dkt. 40 ¶ 36].  However, the analogy is unpersuasive for several reasons.  First, unlike in Walgreen, Becky's alleges no statistics or facts demonstrating that in-state applicants are treated more favorably than out-of-state applicants.  Instead, the Amended Complaint suggests that *no* new license applicants have been successful regardless of their state

8

of origin. See Colon Health Ctrs. of Am., LLC v. Hazel, 813 F.3d 145, 153-54 (4th Cir. 2016) ("[B]oth the application process and its end result . . . showed no appreciable difference in the treatment of in-state and out-of-state entities. This [is] in contrast to programs that revealed marked disparities in the handling of in-state and out-of-state applications." (citing Walgreen, 405 F.3d at 56)). Second, the composition of incumbents under Chapter 58 is not overwhelmingly local—only 56 percent of Medallions[3] are held by local companies [Dkt. 40 ¶¶ 6-7], compared to Walgreen, where over 90 percent of incumbent pharmacies were in-state, 405 F.3d at 53. Third, Chapter 58 contains no express provision insulating incumbents from competitive pressure. In Walgreen, the statute's "fundamental flaw" was that it permitted the Secretary to deny an application based on a determination that an area was already saturated with existing pharmacies. 405 F.3d at 58. Chapter 58 contains no comparable language.

Cumulatively, these allegations suggest that while Chapter 58 may confer some amount of advantage to incumbent agencies, it does not systematically favor in-state businesses over out-of-state competitors. As the First Circuit explained, the ordinance merely reflects a system "that favors incumbents regardless of their status as in-state or out-of-state businesses." Becky's Broncos, 138 F.4th at 79.

### 2.    Pike Balancing

Having found no discriminatory purpose or intent, the Court also declines to apply Pike balancing to weigh Chapter 58's burdens and benefits.[4] In the recent case of Triumph Foods,

---

[3] While Becky's emphasizes that five out of six incumbent agencies are local, Medallion ownership provides the more relevant metric. Chapter 58 caps the "total number of motor vehicles available for lease on the island of Nantucket," not the number of licensees. [Dkt. 40-6 at 2].

[4] Whether and under what circumstances courts may decline to engage in Pike balancing remains unsettled following the Supreme Court's recent decision in National Pork Producers v. Ross, 598 U.S. 356 (2023). As the First Circuit explains, National Pork Producers produced two plurality

LLC v. Campbell, the First Circuit upheld a district court's decision to decline to apply Pike

balancing. 156 F.4th 29 (1st Cir. 2025).  Before the district court was a Massachusetts law

prohibiting the sale of pork derived from pigs confined in gestation crates. See id.  The district

court reasoned that the statute's moral and ethical benefits were nonquantifiable and were better

assessed through the Commonwealth's "citizens petition process." Triumph Foods, LLC v.

Campbell, 715 F. Supp. 3d 143, 151 (D. Mass. 2024), aff'd, 156 F.4th 29.  The First Circuit

affirmed this reasoning.[5] See id.

Here, like the moral concerns at issue in Triumph Foods, many of Chapter 58's asserted

local benefits—such as reducing traffic congestion, noise, pollution, and preserving open park

space and the island's aesthetic and recreational character—are not readily quantifiable.  As the

---

opinions where the Justices agreed that Pike did not apply to the challenged California statute but disagreed as to why. See Triumph Foods, LLC v. Campbell, 156 F.4th 29, 49-50 (1st Cir. 2025) (citing Nat'l Pork Producers, 598 U.S. at 382-83).  Under the first plurality's approach, Pike requires a threshold showing of "substantial harm to interstate commerce." Id.  Under the second plurality's approach, Pike balancing is inappropriate where the statute's benefits are not readily quantifiable, leaving courts ill-suited to weigh economic burdens against noneconomic benefits. Id. at 50.  Because both are plurality opinions, neither carries the precedential force of a majority holding, and it is unclear which rationale a district court may employ in declining to apply Pike. See id.

[5] Another recent First Circuit decision, not raised by either of the Parties, appears to point in a different direction.  In Ass'n To Preserve & Protect Livelihoods v. Sidman, the First Circuit vacated and remanded a district court decision addressing a Maine ordinance that capped the daily number of cruise ship passengers permitted to disembark on a town's shores. 147 F.4th 40, 71-72.  Among other factors, the district court emphasized that the ordinance was enacted through a local democratic process and that its benefits were largely intangible. Id. at 71.  On appeal, the First Circuit rejected that reasoning, explaining that the mere fact a law was democratically enacted does not, standing alone, suffice under Pike. Id. at 71-72.

    The Court reads Sidman as reconcilable with Triumph Foods based on the posture of the two cases.  In Sidman, the district court did not expressly decline to apply Pike at the outset; instead, it proceeded to balance the ordinance's costs and benefits.  The question of whether a court may refuse to undertake Pike balancing in the first instance was therefore not before the First Circuit.  Rather, the court rejected the notion that once a court engages in Pike balancing, it may resolve the balance by relying on the fact that a law was passed democratically.  Triumph Foods, by contrast, approved a district court's decision not to engage in Pike balancing at the outset, as the Court does here.

First Circuit pondered: "How much of a reduction in local congestion must there be to warrant a locality's action that will reduce . . . traffic in [a town] and beyond?" Sidman, 147 F.4th at 71. Balancing these incommensurable social and policy interests against the alleged burdens on interstate commerce would require the Court to make value judgments that are more appropriately reserved to the political process. Id.; see Triumph Foods, 715 F. Supp. 3d at 151. Indeed, Chapter 58 was adopted through local democratic means, underscoring that the ordinance reflects policy determinations committed to the Town's voters and their elected representatives. [Dkts. 40-2; 40-4; 40-5].  Under these circumstances, the Court concludes that Pike balancing is inappropriate and declines to apply it.

Even if the Court were to weigh the burdens and benefits, Becky's would still fail to state a viable claim.  Under Pike, the plaintiff has the burden of showing that a nondiscriminatory regulatory measure imposes burdens on interstate commerce that are "clearly excessive" compared to putative local benefits. See Walgreen, 405 F.3d at 55; N.H. Motor Transp. Ass'n v. Flynn, 751 F.2d 43, 48 (1st Cir. 1984).  This is a demanding standard; "the Supreme Court has not invalidated a law under Pike in more than 30 years." Triumph Foods, 156 F.4th at 48 (quoting Flynt v. Bonta, 131 F.4th 918, 931 (9th Cir. 2025), cert. denied, No. 25-173, 2026 WL 79841 (U.S. Jan. 12, 2026)).

Here, Becky's asserts that Chapter 58's Medallion cap leads to higher rental prices, hoarding by incumbent agencies, limited market choice, and delays for prospective renters. [Dkt. 40-1 at 3].  According to Becky's, if no rental cars are available on a given date, visitors' only practical alternative is to pay approximately $640 to ferry a vehicle to the island. [Dkt. 40 ¶ 38]. Even accepting these allegations as true, however, Becky's has not plausibly demonstrated that such burdens are "clearly excessive" in relation to the ordinance's local benefits.  While scarcity

11

and higher rental costs may result from the combined effect of the regulatory cap and Hertz's alleged hoarding of Medallions, these effects appear marginal as alleged. First, the ordinance does not eliminate a mode of transportation altogether; it merely shifts reliance from certain suppliers to others. Visitors can still ferry a car to the island, rent from an incumbent agency or Turo, or rely on public transit or other modes of transportation. See Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127 (1978) ("[I]nterstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another."); Rosenblatt v. City of Santa Monica, 940 F.3d 439, 453 (9th Cir. 2019) (upholding an ordinance that merely "diverts [a city's] tourism dollars from vacation rentals to hotels."). Moreover, Becky's alleges that only 650 of 500,000 annual visitors—approximately 0.1 percent—ferry a rental car to the island and thus might be impacted by the ordinance. Cf. Sidman, 147 F.4th at 66 (ordinance capping cruise docking reduces cruise passenger visitation volume by 80 to 90 percent).

On the other hand, Chapter 58 advances several legitimate local interests, including managing traffic and congestion, parking, and the preservation of public and recreational space on a small island. Becky's Broncos, 2024 WL 3402769, at *5. These objectives lie at the heartland of local government authority and courts routinely recognize them as valid local concerns. See Naser Jewelers, Inc. v. City of Concord, 513 F.3d 27, 34 (1st Cir. 2008) (recognizing "traffic safety and community aesthetics" as "constitut[ing] significant governmental interests"). Although Becky's contends that Chapter 58's effectiveness is undermined by the continued operation of Turo, this fact alone is not persuasive. While Turo may reduce the ordinance's overall effectiveness, Chapter 58, as alleged, still provides a net local benefit. Indeed, the Amended Complaint alleges that the total number of cars on the island has

remained consistent at approximately 5,500 despite population growth and the additional 200 cars from Turo, which suggests that Chapter 58 is at least somewhat effective in limiting vehicle volume. [See Dkt. 40-1 at 6].

Balancing these factors, even drawing all reasonable inferences in Becky's favor, the Amended Complaint does not plausibly allege that Chapter 58 imposes an unconstitutional burden on interstate commerce.

### B.    Counts 2 and 3: Antitrust Laws

Becky's second and third claims allege violations of federal and state antitrust law, contending that Chapter 58 "creates a Town-sanctioned oligopoly." [Dkt. 40 ¶ 25].  The federal claim arises under Section 1 of the Sherman Act, while the state claim is brought under the Massachusetts Antitrust Act.  Massachusetts courts construe state antitrust law in harmony with federal antitrust statutes, so the Court analyzes both claims in tandem under the Sherman Act. See Monsanto Co. v. Dep't of Pub. Utils., 412 Mass. 25, 28-30 (1992).

#### 1.    State-Action Immunity

The Town argues that Chapter 58 is shielded from Sherman Act liability under the doctrine of state-action immunity, citing the Court's prior denial of Becky's motion for preliminary injunction.  The "law of the case" doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Naser Jewelers, Inc. v. City of Concord, 538 F.3d 17, 20 (1st Cir. 2008) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)).  However, the law of the case is a prudential rule only; it is not "an inflexible straitjacket that invariably requires rigid compliance." Cohen v. Brown Univ., 101 F.3d 155, 168 (1st Cir. 1996).  Here, the Court finds it appropriate to revisit its analysis on state-action immunity in light of the First Circuit's opinion on appeal.

13

State-action immunity shields states from Sherman Act liability for regulatory measures that impose anticompetitive restraints. Parker v. Brown, 317 U.S. 341, 352 (1943); Fisichelli v. Town of Methuen, 956 F.2d 12, 14 (1st Cir. 1992).  Municipalities are generally not entitled to this immunity unless their actions are "undertaken pursuant to a 'clearly articulated and affirmatively expressed' state policy to displace competition." F.T.C. v. Phoebe Putney Health Sys., Inc., 568 U.S. 216, 226 (2013).  To pass the "clear articulation" test, a state legislature need not expressly state that it intends for the delegated action to have anticompetitive effects. Town of Hallie v. City of Eau Claire, 471 U.S. 34, 43 (1985).  Rather, state-action immunity applies "if the anticompetitive effect was the 'foreseeable result' of what the State authorized." Phoebe Putney, 568 U.S. at 226-27.  Foreseeability requires more than a grant of broad, neutral authority to govern local affairs. See id. at 225-27; Cmty. Commc'ns Co. v. Boulder, 455 U.S. 40, 52, 55 (1982).  Instead, foreseeability requires that the statutory language expressly or implicitly reflect that the legislature contemplated the anticompetitive actions taken by the municipality. See Rectrix Aerodrome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n, 610 F.3d 8, 13 (1st Cir. 2010); Interface Group, Inc. v. Mass. Port Auth., 816 F.2d 9, 13-14 (1st Cir. 1987).

Here, the Town contends that Chapter 58's anticompetitive effects were the "foreseeable result" of Chapter 266 of the Acts of 1989 ("Chapter 266").  Chapter 266 authorizes municipalities to:

> enact by-laws requiring the annual licensing of motor vehicle rental agencies and the payment fees for such licenses not exceeding one hundred dollars per vehicle; provided, however, no such by-law shall require the payment of a fee for a motor vehicle upon which an excise has been assessed, levied and paid under the provisions of chapter sixty A of the General Laws by said town.

1989 Mass. Acts ch. 266.9.  The Town argues that the fee exemption for vehicles that have already paid an excise tax to the Town (and thus, are presumably garaged in Nantucket) reflects a "clearly articulated" policy of displacing out-of-state competition. [Dkt. 44 at 18].

14

On closer review of the record and statutory language, the Court concludes that Chapter 58's anticompetitive effects were not a "foreseeable result" of Chapter 266. Chapter 266 merely grants broad, neutral authority to set fees and regulate licensing. See Phoebe Putney, 568 U.S. at 266-27 (finding no state-action immunity for law permitting municipalities to create local hospital authorities with general powers to lease property, set rates, to sue, borrow money, and otherwise exercise the powers of a private corporation). Even if the statute authorizes the Town to require agencies to pay for licenses to operate on the island, such fees are minimal and apply to all applicants. The statute does not advantage any category of businesses or contemplate the displacement of competition. Cf. Rectrix Aerodrome, 610 F.3d at 8 (upholding state-action immunity where statute "goes out of its way to include a section specifically prohibiting exclusive contracts . . . which surely suggests that the legislature did perceive that the airport might otherwise employ exclusivity restrictions (and chose to ban only this narrow set)"); Carey & Assocs., P.A. v. Sheriffs & Ctys. of Cumberland, 320 F. Supp. 3d 226, 230 (D. Me. 2018) (upholding state-action immunity where state law compelled sheriffs and deputies to act as the primary process servers within the state, thus displacing private competition). Likewise, the fee exemption does not favor local vehicles or agencies, as the Town argues, but only seeks to avoid the unintended effect of double taxation. That is, it merely prevents the Town from collecting tax twice on a vehicle: once under Mass. Gen. L. 60A as an excise tax, and another time as a licensing fee. Accordingly, Chapter 58's anticompetitive effects were not a "foreseeable result" of Chapter 266, and the Town is not entitled to state-action immunity.

## 2.   Merits

Even without state-action immunity, Becky's has not adequately pleaded a claim under Section 1 of the Sherman Act. Section 1 prohibits "[e]very contract, combination . . . or

15

conspiracy, in restraint of trade." 15 U.S.C. § 1.  To state a claim, a plaintiff must show: (1) "concerted action between two or more separate parties," and (2) "that such action unreasonably restrains trade." Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d 6, 12 (1st Cir. 2003).  Whether action is "concerted" turns on whether it "stem[s] from [an] independent decision or from an agreement, tacit or express." Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 43 (1st Cir. 2013) (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)).  An agreement may be inferred when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Id. (quoting Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984)).  Mere allegations of "parallel conduct," however, are insufficient; some "further circumstance pointing toward a meeting of the minds" is required, including "the general contours of when an agreement was made" and "allegations with a context that tends to make said agreement plausible." Id. at 43, 46 (quoting Twombly, 550 U.S. at 557).  In Evergreen, for example, the First Circuit upheld a Section 1 claim where the plaintiff identified a specific meeting as the "locus of agreement," alleged motive and opportunity (including a heavily concentrated market with long-term exclusive contracts), and pointed to conduct that was "difficult to explain outside the context of a conspiracy." Id. at 47-49.

Here, Becky's highlights several facts, but none plausibly support an inference of concerted action, tacit or explicit, between the Town and incumbent rental agencies in enacting or maintaining Chapter 58.  The Amended Complaint contains only conclusory allegations that "[t]here is a conspiracy between the Town and the [incumbent rental agencies]" to "limit rental cars and raise the price of rental cars for the benefit" of the agencies and the Town. [Dkt. 40 ¶ 26].  It does not identify any plausible factual basis for such an agreement.

16

Becky's points to the following facts in support of its claim. First, Becky's contends that Chapter 58 was "drafted and agreed to" by the incumbent agencies. [Dkt. 50 at 15]. To support this conclusion, Becky's points to the ordinance's enactment by town vote, including the owners of the agencies, and the fact that it grandfathered incumbents and allocated Medallions among them. [Dkts. 40 ¶ 10; 50 at 14-15]. Put simply, the theory is that because the ordinance benefits incumbent agencies and those same agencies voted on it, they must have played a role in drafting it. But this falls short of a reasonable, rather than speculative, inference. As the Supreme Court has explained, "[t]he ordinary relationship between the government and those who must obey its regulatory commands . . . is not enough to establish a conspiracy." Fisher v. City of Berkeley, Cal., 475 U.S. 260, 267 (1986). While some "hybrid" governmental restraints may constitute concerted action, plaintiffs must show that the regulatory measure grants private parties "a degree of private regulatory power." Id. at 268-69 (describing examples of such "private price-fixing conspirac[ies], concealed under a 'gauzy cloak of state involvement'" (quoting Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 106 (1980))). Here, Becky's allegation is essentially that incumbent operators voted in their own interests—a normal and lawful exercise of political participation, hardly evidence of wrongdoing. Id. at 269 ("Adopted by popular initiative, the Ordinance can hardly be viewed as a cloak for any conspiracy . . . between [private entities] and the municipality."). Nor is Chapter 58 a "hybrid" price-fixing scheme, as it does not grant incumbents the authority to set prices or Medallion levels that the Town must then enforce against others. Instead, the Town retains the authority to raise or lower the Medallion levels. Cf. id. ("While the Ordinance does give . . . a group of interested private parties . . . some power to trigger the enforcement of its provisions, it places complete control over maximum rent levels exclusively in the hands of the [government].").

Beyond this argument, Becky's also alleges that the Town has not reissued eight surrendered Medallions, reducing supply and raising prices. [Dkt. 40 ¶ 28]. The Town's inaction, however, is independent and unilateral—there is no allegation that any of the incumbent agencies colluded with the Town to encourage such behavior. Similarly, Becky's alleges that Hertz is "sitting on unused medallions to further reduce supply and increased prices." [Id. ¶ 26]. Again, this is unilateral conduct by the company, with no allegation that the Town directed or colluded in this practice. Becky's further alleges that Chapter 58 was amended in 1998 to correct a miscalculation of Hertz's Medallions. [Dkt. 40-5]. At most, this reflects a correction of a clerical or administrative mistake and does not support a plausible inference of collusion between Hertz and the Town. Finally, Becky's alleges that the Town declined to enforce the ordinance against Turo. [Dkt. 40 ¶ 34]. However, this fact *undermines* an inference of a collusion, as the Town's non-enforcement disadvantages the incumbents, who have complained about additional competition from Turo.[6] [Id. ¶ 32].

In sum, none of Becky's allegations plausibly suggest an agreement between the Town and incumbent agencies. There is no allegation of when or how such an agreement formed, the circumstances surrounding it, or the Town's motive to collude. See DM Rsch., Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 57 (1st Cir. 1999) (dismissing Section 1 claim where plaintiff failed to "allege[] *facts* indicating an agreement—instead of merely asserting a conspiracy in conclusory terms" (emphasis in original)). Because Becky's fails to plausibly allege concerted action, the Court need not address whether any purported conduct constitutes an unreasonable restraint on trade. Accordingly, Becky's fails to state a claim under Section 1 of the Sherman

---

[6] Even if this fact could arguably support an inference of collusion between the Town and Turo, the Amended Complaint alleges a conspiracy only between the Town and the six incumbent operators. [Dkt. 40 ¶ 26].

18

Act, and its Massachusetts Antitrust Act claim likewise fails.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike Exhibit 1 of the Amended

Complaint [Dkt. 45] is **DENIED**, and Defendants' Motion to Dismiss for Failure to State a

Claim is [Dkt. 43] is **GRANTED**.

**SO ORDERED.**

Dated: March 27, 2026                                        /s/ Angel Kelley_____
                                                            Hon. Angel Kelley
                                                            United States District Judge